AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2018 APR 23 PM 12: 03
U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| | |
|---|---|
| United States of America<br>v.<br>Damone ALEXANDER<br><br>Defendant(s) | Case No. 3:18 mj 327 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **4/2018** in the county of **Montgomery** in the **Southern** District of **Ohio**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 846 & 841(b)(1)(A) | attempt to possess with intent to distribute 1 kilogram or more of fentanyl |

This criminal complaint is based on these facts:

See Attached Affidavit of Brian Turk

☑ Continued on the attached sheet.

_Complainant's signature_

Brian Turk, SA of HSI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 4/23/18

_Judge's signature_

City and state: Dayton, Ohio

Michael Newman, US Magistrate Judge
_Printed name and title_

ATTACHMENT "A"

AFFIDAVIT

1. I, Brian Turk, a Special Agent of Homeland Security Investigations (HSI), United States Department of Homeland Security, am hereinafter referred to as Affiant. As such, Affiant sets forth the following in support of an arrest warrant for Damone ALEXANDER.

2. Affiant is an employee of Homeland Security Investigations assigned to the Cincinnati Resident Office. Affiant has been employed with HSI since November of 2012. Affiant attended and graduated from the basic agent training course in Brunswick, Georgia. Prior to this, Affiant was a Special Agent for five years with the United States Secret Service (USSS) in Newark, New Jersey and a Border Patrol Agent for two years with the United States Border Patrol in Yuma, Arizona. Affiant has received extensive training in the investigation of narcotics trafficking and financial crimes from the USSS and Homeland Security Investigations, as well as ongoing in-service training.

3. Between August 2013, and April 2018, Affiant has been assigned to the Homeland Security Investigations (HSI) Border Enforcement Security Task Force (BEST) in Dayton, Ohio.

4. As a Special Agent for Homeland Security Investigations, Affiant is charged with the duty of enforcing among other Titles, the Controlled Substance Act, Title 21, United States Code, together with other assigned duties as imposed by federal law.

5. By virtue of Affiant's employment with the HSI, he performs and has performed various tasks which include, but are not limited to:

    a) Functioning as a surveillance agent for the primary purpose of observing and movements of drug traffickers and those suspected of trafficking in drugs;

b) Functioning as a case agent which entails the supervision of specific aspects of drug investigations;

c) The tracing and tracking of monies and assets gained by drug traffickers from the illegal sale of drugs.

6. This Affidavit is submitted in support of a criminal complaint, and seeks the issuance of an arrest warrant against, Damone ALEXANDER (**ALEXANDER**), for violations of 21 U.S.C. §§ 846 and 841(b)(1)(A) (attempt to possess with intent to distribute 1 kilogram or more of fentanyl, a Schedule II controlled substance). The information contained in this Affidavit is largely based upon an investigation conducted by your Affiant and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, rather only information necessary to establish probable cause of the above-described violations.

## FACTS SUPPORTING PROBABLE CAUSE

7. As detailed more fully below, since January 2018, Damone Alexander, an individual linked to both 5041 Well Fleet Drive and 132 WestRock Drive, has been negotiating the purchase of one kilogram of fentanyl from a cooperating defendant (hereinafter "CD").

8. During late January 2018, federal agents arrested the CD in Riverside, California with approximately thirty-three pounds of 4-ANPP, a schedule II controlled substance and primary precursor of fentanyl. After his arrest, the CD agreed to assist law enforcement in an effort to mitigate his sentencing exposure. In speaking with law enforcement, the CD advised that a source of supply in Mexico intended to deliver multiple kilograms of fentanyl to the CD. The CD indicated that, upon receiving these drugs, he/she then planned to hand deliver these illegal controlled substances to buyers in, among other places, Dayton, Ohio.

9. In an effort to corroborate the information from the CD, during early 2018, federal agents had the CD participate in one or more consensually recorded telephone calls to his customer in Dayton, Ohio – namely, Damone Alexander. (Based on physical surveillance described below, agents confirmed that Alexander was the customer in Dayton to whom the CD had planned to deliver the controlled substances). Consistent with these instructions, the CD contacted Alexander at telephone number 615-480-8858, and engaged in a general conversation concerning the anticipated drug delivery. Sometime after this conversation, Alexander, utilizing 615-480-8858, sent a text message to the CD. In that text message, Alexander sent a picture of a suspected bag of methamphetamine; Alexander indicated that he also wanted the CD to deliver more of this drug, i.e., methamphetamine, to him as well.

10. On or about March 8, 2018, the Honorable Sharon Ovington signed a federal search warrant authorizing the collection of certain location information for telephone number 615-480-8858. The following day -- March 9, 2018 -- Alexander contacted the CD from phone number 424-288-0932. During this case – which was recorded and monitored – Alexander advised that this 424 number was his new phone. Using coded language, the CD and Alexander discussed the price at which the CD would sell the purported kilogram of fentanyl to Alexander. The CD and Alexander also discussed whether Alexander intended to test the drugs before turning over the money for the purchase. During this call, investigators checked the location information collected from the search warrant for 615-480-8858. That location information placed that phone in the vicinity of 5041 Well Fleet Drive.

11. On or about March 12, 2018, the Honorable Sharon Ovington signed a federal search warrant authorizing the collection of certain location information for telephone number 424-288-0932.

12. On or March 14, 2018, the CD and Alexander participated in an in-person meeting in Beavercreek, Ohio. On the day of, but prior to, that meeting, Alexander contacted the

CD from phone number 424-288-0932. During this conversation, Alexander and the CD discussed the meeting, and Alexander advised that he was about twenty minutes away from the meet location. In the moments before this call, investigators checked the location information collected from the search warrants for 615-480-8858 and 424-288-0932. This information placed both phones in the vicinity of 5041 Well Fleet Drive. Specifically, both phone pings registered a 1370 meter location radius, in which 5041 Well Fleet Drive was located inside.

13. On or about March 14, 2018, after the call, agents established surveillance near the planned meet location – namely, Chuy's Restaurant in Beavercreek, Ohio. Soon thereafter, investigators saw the CD and Alexander separately arrive in the restaurant's parking lot. Alexander was driving a black Chrysler 300 displaying Ohio dealer tag 003A1QM, registered to Let's Make a Deal Auto Sales. Alexander and the CD greeted one another with a fist bump and then entered the restaurant together. During the ensuing meeting, through coded language, Alexander and the CD again discussed the fentanyl purchase, including a purported delay in the anticipated shipment. At the conclusion of the meeting, Alexander left Chuy's, entered the Chrysler 300 and drove away. Investors followed Alexander as he traveled to, and then stayed at, a nearby spa for a period of time. Alexander ultimately left the spa at which time agents resumed their surveillance of him. Investigators followed Alexander as he returned to 5041 Well Fleet Drive.

14. On the morning of March 15, 2018, agents conducted a spot check at 5041 Well Fleet Drive, but did not observe the Chrysler 300 at that residence. Investigators promptly turned their attention to 132 WestRock Drive, another residence associated with Alexander. At that location, agents found the Chrysler 300 parked in the driveway of the residence. Investigators checked the location information collected from the search warrants for 615-480-8858 and 424-288-0932. This information placed both phones in the vicinity of 132 WestRock Drive around that time.

15. On or about April 10, 2018, investigators conducted a utility search for 5041 Well Fleet Drive and confirmed that Alexander had power registered in his name at this location. Additionally, the subscriber information for this account listed a telephone number of 937-529-1528. Based on a response to an administrative subpoena, Sprint confirmed that 937-529-1528 was subscribed to Alexander at 5041 Well Fleet Drive.

16. In the days preceding April 12, 2018, Alexander contacted the CD via Blackberry Instant messenger on multiple occasions. During these messenger exchanges, the CD told **ALEXANDER** that a courier of the CD's would be in Dayton, Ohio with a kilogram of fentanyl and the courier would deliver the fentanyl to **ALEXANDER** in exchange for $50,000. **ALEXANDER** responded to have the CD's courier contact **ALEXANDER** at telephone number 424-288-0932 to discuss the time and location of the exchange. (In reality, the CD's courier was an undercover agent (UC).

17. On April 12, 2018, investigators with HSI, Federal Bureau of Investigations (FBI) and DEA attempted an Under Cover (UC) delivery of one sham (fake) kilogram of fentanyl with **ALEXANDER**, at the Meijer parking lot located at 9200 N. Main, Englewood, OH.

18. Prior to the UC sham fentanyl delivery, the CD contacted **ALEXANDER** to tell him the CD's courier was in town and ready to deliver the kilogram of fentanyl to **ALEXANDER**.

19. Previous communication between the CD and **ALEXANDER** indicated **ALEXANDER** wanted to test the fentanyl before **ALEXANDER** would pay for it. At approximately 12:00 p.m. at the direction of agents the CD sent **ALEXANDER** a video obtained from the Mexican Drug Trafficking Organization (DTO) which the CD works for. The video sent to **ALEXANDER** depicts a woman allegedly overdosing from fentanyl exposure. The CD told **ALEXANDER** that the fentanyl that **ALEXANDER** would be buying is from the same batch that the women in the video was allegedly overdosing on. **ALEXANDER** replied with a voice message, "lol," in reference to purchasing the fentanyl from the CD's courier at the Meijer in Englewood, OH.

20. At approximately, 1:30 p.m. an HSI Under Cover Agent (UC) contacted **ALEXANDER** at 424-288-0932 and told **ALEXANDER** that he had the kilogram of fentanyl with him/her and would meet **ALEXANDER** at the Meijer parking lot in Englewood, OH. **ALEXANDER** told the UCA that Meijer was "hot", meaning a lot of police presence. **ALEXANDER** attempted to sway both the UC and the CD to change the location of the exchange over the next thirty (30) minutes through multiple recorded telephone calls with the UC and BBM with the CD.

21. At approximately 2:00 p.m. **ALEXANDER** sent a message to the CD agreeing to meet the UC at the Meijer parking and that **ALEXANDER** needed twenty-five (25) minutes to grab the money.

22. At approximately 2:40 p.m. investigators observed **ALEXANDER** pull into the south entrance of the Meijer parking lot driving a black, Chrysler 300, Ohio registration A1QM#3. **ALEXANDER** parked in the rear of the Steak and Shake restaurant and appeared to be conducting counter-surveillance to observe if any Police may be in the area.

23. **ALEXANDER** again contacted the CD and told the CD that Meijer was "hot" and wanted the UC to follow **ALEXANDER** to a different location because **ALEXANDER** did not have a good "feeling" about meeting in the Meijer parking lot.

24. **ALEXANDER** then drove toward the UC'S Ford Expedition which was parked in the south west corner of the Meijer parking lot. **ALEXANDER** extended his hand through the driver's side window of the Chrysler 300 while holding what was later determined to be $50,000 in U.S. Currency in the other hand. At the last moment **ALEXANDER** withdrew his hand and did not accept the sham package of fentanyl; however the UCA did observe **ALEXANDER** in possession of the U.S. Currency.

25. Investigators observed and followed **ALEXANDER** as he drove through the parking lot of Meijer and then turned south on N. Main St. Investigators were observing **ALEXANDER** using mobile surveillance as well as using a Customs and Border Protection (CBP) Air and Marine Helicopter equipped with a video recording system.

26. At approximately 2:42 p.m., a Trooper with Ohio State Highway Patrol (OSP) who was assisting with operation conducted a traffic stop of **ALEXANDER** due an equipment violation on the Chrysler 300. The traffic stop location was directly across N. Main Street from Meijer's north parking lot entrance.

27. An OSP state certified narcotics detection K9 conducted a free air sniff of the vehicle **ALEXANDER** was operating which resulted in a positive indication for the presence of narcotics. OSP Sgt. Coverstone asked **ALEXANDER** where he was headed to which **ALEXANDER** replied, he was going to Steak and Shake, then McDonalds and then to the Gym.

28. At 2:52 p.m. Sgt. Coverstone advised **ALEXANDER** of his Miranda rights and talked to **ALEXANDER** about marijuana being in his vehicle. **ALEXANDER** gave Sgt. Coverstone a EVAP THC pen from his shirt and told Sgt. Coverstone that he smokes it and that the pen has THC in it. **ALEXANDER** told Sgt. Coverstone that he had cash in his vehicle that was about "50 some grand." When Sgt. Coverstone questioned **ALEXANDER** about the currency in the back seat, **ALEXANDER** stated that he owns a car lot and just sold an SRT8 and that he was taking the currency from the car lot to his house but stopped for something to eat.

29. A probable search was conducted of **ALEXANDER'S** vehicle which led to the discovery of $50,000 of U.S. Currency inside a shoe box located in the back seat and an opened vacuum seal bag containing fifty-five (55) .55ml alleged THC liquid refill bottles and five packs of alleged THC edibles. The THC bottles appeared all to be full with a converted weight of 23.68 grams and the THC edibles weighed 312 grams.

30. **ALEXANDER** was transported to the Dayton OSP Post by OSP Troopers for further interview by investigators with HSI and DEA.

31. At approximately 3:25 p.m., your Affiant along with DEA Special Agent (SA) Charles Vill conducted an audio recorded interview with Damone **ALEXANDER** at the OSP Dayton Post in a conference room. **ALEXANDER** was not handcuffed and agents were

wearing plain clothes with their weapons concealed. **ALEXANDER** was advised that he was not under arrest. Your Affiant and SA Vill introduced themselves to **ALEXANDER** by displaying their credentials and informed **ALEXANDER** the Special Agents were going to question him regarding the circumstances surrounding the currency discovered in his vehicle.

32. Your Affiant informed **ALEXANDER** that although his Miranda rights were given to him by OSP Sgt. Coverstone SA Turk would cover them again. SA Turk read the Miranda rights to **ALEXANDER** to which **ALEXANDER** said he understood but was he was unwilling to sign the Department of Homeland Security waiver of rights Miranda form. **ALEXANDER** did indicate he was willing to speak with agents without a lawyer present.

33. In whole and in part, **ALEXANDER** gave the following information regarding the $50,000 U.S. Currency discovered in his vehicle: **ALEXANDER** was moving his savings from his residence at 132 Westrock Farm Dr., Union, OH to his residence on Well Fleet Dr., Dayton, OH due to a break-in at a neighbor's house and car break-ins on Westrock Farm Dr. and fear of losing his savings.

34. **ALEXANDER** would go on to contradict the addresses from which he was moving the currency and stated he was moving the currency from his residence on 5041 Well Fleet Dr. to 132 Westrock Farm Dr. **ALEXANDER** stated he doesn't like to keep his money in a safe or the bank.

35. **ALEXANDER** stated he owns "Let's Make a Deal Auto Sale" car dealership as well as the real estate Let's Make a Deal Auto Sale occupies. **ALEXANDER** stated the property has two other car dealerships on it as well. **ALEXANDER** stated the $50,000 that OSP discovered in his vehicle was proceeds he saved from the sale of vehicles from his dealerships, DLA LLC and Let's Make a Deal.

36. Following the interview, **ALEXANDER** called his fiancée from the Dayton OSP Post for a ride home due to him having a suspended driver's license. Investigators conducting surveillance observed a female depart **ALEXANDER'S** residence at 132 Westrock Farm

Dr., Union, OH driving a black Chevy Sedan. A short time later, investigators observed a female operating a similar black Chevy Sedan pull into the Dayton OSP Post and meet with **ALEXANDER**.

37. The suspected THC liquid bottles and edibles were submitted to the OSP Crime lab for analysis.

38. At approximately 6:00 p.m., the CD received several text messages from **ALEXANDER**. **ALEXANDER** explained that he "pulled off" (from the fentanyl purchase at Meijer) because "it didn't feel right." ALEXANDER went on to say that "I told you it was hot in that area," and that "they took my money."

39. Based on the facts set forth in the Affidavit, your Affiant believes that there is probable cause to issue a criminal complaint and arrest warrant against Damone **ALEXANDER** (**ALEXANDER**), for violations of 21 U.S.C. §§ 846 and 841(b)(1)(A) (attempt to possess with intent to distribute 1 kilogram or more of fentanyl, a Schedule II controlled substance).

_____
Brian Turk, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on April 23, 2018

_____
Honorable Michael J. Newman
United States Magistrate Judge

ATTACHMENT "A"

AFFIDAVIT

1. I, Brian Turk, a Special Agent of Homeland Security Investigations (HSI), United States Department of Homeland Security, am hereinafter referred to as Affiant. As such, Affiant sets forth the following in support of an arrest warrant for Damone ALEXANDER.

2. Affiant is an employee of Homeland Security Investigations assigned to the Cincinnati Resident Office. Affiant has been employed with HSI since November of 2012. Affiant attended and graduated from the basic agent training course in Brunswick, Georgia. Prior to this, Affiant was a Special Agent for five years with the United States Secret Service (USSS) in Newark, New Jersey and a Border Patrol Agent for two years with the United States Border Patrol in Yuma, Arizona. Affiant has received extensive training in the investigation of narcotics trafficking and financial crimes from the USSS and Homeland Security Investigations, as well as ongoing in-service training.

3. Between August 2013, and April 2018, Affiant has been assigned to the Homeland Security Investigations (HSI) Border Enforcement Security Task Force (BEST) in Dayton, Ohio.

4. As a Special Agent for Homeland Security Investigations, Affiant is charged with the duty of enforcing among other Titles, the Controlled Substance Act, Title 21, United States Code, together with other assigned duties as imposed by federal law.

5. By virtue of Affiant's employment with the HSI, he performs and has performed various tasks which include, but are not limited to:

   a) Functioning as a surveillance agent for the primary purpose of observing and movements of drug traffickers and those suspected of trafficking in drugs;

    b) Functioning as a case agent which entails the supervision of specific aspects of drug investigations;

    c) The tracing and tracking of monies and assets gained by drug traffickers from the illegal sale of drugs.

6. This Affidavit is submitted in support of a criminal complaint, and seeks the issuance of an arrest warrant against, Damone ALEXANDER (**ALEXANDER**), for violations of 21 U.S.C. §§ 846 and 841(b)(1)(A) (attempt to possess with intent to distribute 1 kilogram or more of fentanyl, a Schedule II controlled substance). The information contained in this Affidavit is largely based upon an investigation conducted by your Affiant and other law enforcement officers. All of the details of the investigation are not included in this Affidavit, rather only information necessary to establish probable cause of the above-described violations.

## FACTS SUPPORTING PROBABLE CAUSE

7. As detailed more fully below, since January 2018, Damone Alexander, an individual linked to both 5041 Well Fleet Drive and 132 WestRock Drive, has been negotiating the purchase of one kilogram of fentanyl from a cooperating defendant (hereinafter "CD").

8. During late January 2018, federal agents arrested the CD in Riverside, California with approximately thirty-three pounds of 4-ANPP, a schedule II controlled substance and primary precursor of fentanyl. After his arrest, the CD agreed to assist law enforcement in an effort to mitigate his sentencing exposure. In speaking with law enforcement, the CD advised that a source of supply in Mexico intended to deliver multiple kilograms of fentanyl to the CD. The CD indicated that, upon receiving these drugs, he/she then planned to hand deliver these illegal controlled substances to buyers in, among other places, Dayton, Ohio.

9. In an effort to corroborate the information from the CD, during early 2018, federal agents had the CD participate in one or more consensually recorded telephone calls to his customer in Dayton, Ohio – namely, Damone Alexander. (Based on physical surveillance described below, agents confirmed that Alexander was the customer in Dayton to whom the CD had planned to deliver the controlled substances). Consistent with these instructions, the CD contacted Alexander at telephone number 615-480-8858, and engaged in a general conversation concerning the anticipated drug delivery. Sometime after this conversation, Alexander, utilizing 615-480-8858, sent a text message to the CD. In that text message, Alexander sent a picture of a suspected bag of methamphetamine; Alexander indicated that he also wanted the CD to deliver more of this drug, i.e., methamphetamine, to him as well.

10. On or about March 8, 2018, the Honorable Sharon Ovington signed a federal search warrant authorizing the collection of certain location information for telephone number 615-480-8858. The following day -- March 9, 2018 -- Alexander contacted the CD from phone number 424-288-0932. During this case – which was recorded and monitored – Alexander advised that this 424 number was his new phone. Using coded language, the CD and Alexander discussed the price at which the CD would sell the purported kilogram of fentanyl to Alexander. The CD and Alexander also discussed whether Alexander intended to test the drugs before turning over the money for the purchase. During this call, investigators checked the location information collected from the search warrant for 615-480-8858. That location information placed that phone in the vicinity of 5041 Well Fleet Drive.

11. On or about March 12, 2018, the Honorable Sharon Ovington signed a federal search warrant authorizing the collection of certain location information for telephone number 424-288-0932.

12. On or March 14, 2018, the CD and Alexander participated in an in-person meeting in Beavercreek, Ohio. On the day of, but prior to, that meeting, Alexander contacted the

CD from phone number 424-288-0932. During this conversation, Alexander and the CD discussed the meeting, and Alexander advised that he was about twenty minutes away from the meet location. In the moments before this call, investigators checked the location information collected from the search warrants for 615-480-8858 and 424-288-0932. This information placed both phones in the vicinity of 5041 Well Fleet Drive. Specifically, both phone pings registered a 1370 meter location radius, in which 5041 Well Fleet Drive was located inside.

13. On or about March 14, 2018, after the call, agents established surveillance near the planned meet location – namely, Chuy's Restaurant in Beavercreek, Ohio. Soon thereafter, investigators saw the CD and Alexander separately arrive in the restaurant's parking lot. Alexander was driving a black Chrysler 300 displaying Ohio dealer tag 003A1QM, registered to Let's Make a Deal Auto Sales. Alexander and the CD greeted one another with a fist bump and then entered the restaurant together. During the ensuing meeting, through coded language, Alexander and the CD again discussed the fentanyl purchase, including a purported delay in the anticipated shipment. At the conclusion of the meeting, Alexander left Chuy's, entered the Chrysler 300 and drove away. Investors followed Alexander as he traveled to, and then stayed at, a nearby spa for a period of time. Alexander ultimately left the spa at which time agents resumed their surveillance of him. Investigators followed Alexander as he returned to 5041 Well Fleet Drive.

14. On the morning of March 15, 2018, agents conducted a spot check at 5041 Well Fleet Drive, but did not observe the Chrysler 300 at that residence. Investigators promptly turned their attention to 132 WestRock Drive, another residence associated with Alexander. At that location, agents found the Chrysler 300 parked in the driveway of the residence. Investigators checked the location information collected from the search warrants for 615-480-8858 and 424-288-0932. This information placed both phones in the vicinity of 132 WestRock Drive around that time.

15. On or about April 10, 2018, investigators conducted a utility search for 5041 Well Fleet Drive and confirmed that Alexander had power registered in his name at this location. Additionally, the subscriber information for this account listed a telephone number of 937-529-1528. Based on a response to an administrative subpoena, Sprint confirmed that 937-529-1528 was subscribed to Alexander at 5041 Well Fleet Drive.

16. In the days preceding April 12, 2018, Alexander contacted the CD via Blackberry Instant messenger on multiple occasions. During these messenger exchanges, the CD told **ALEXANDER** that a courier of the CD's would be in Dayton, Ohio with a kilogram of fentanyl and the courier would deliver the fentanyl to **ALEXANDER** in exchange for $50,000. **ALEXANDER** responded to have the CD's courier contact **ALEXANDER** at telephone number 424-288-0932 to discuss the time and location of the exchange. (In reality, the CD's courier was an undercover agent (UC).

17. On April 12, 2018, investigators with HSI, Federal Bureau of Investigations (FBI) and DEA attempted an Under Cover (UC) delivery of one sham (fake) kilogram of fentanyl with **ALEXANDER**, at the Meijer parking lot located at 9200 N. Main, Englewood, OH.

18. Prior to the UC sham fentanyl delivery, the CD contacted **ALEXANDER** to tell him the CD's courier was in town and ready to deliver the kilogram of fentanyl to **ALEXANDER**.

19. Previous communication between the CD and **ALEXANDER** indicated **ALEXANDER** wanted to test the fentanyl before **ALEXANDER** would pay for it. At approximately 12:00 p.m. at the direction of agents the CD sent **ALEXANDER** a video obtained from the Mexican Drug Trafficking Organization (DTO) which the CD works for. The video sent to **ALEXANDER** depicts a woman allegedly overdosing from fentanyl exposure. The CD told **ALEXANDER** that the fentanyl that **ALEXANDER** would be buying is from the same batch that the women in the video was allegedly overdosing on. **ALEXANDER** replied with a voice message, "lol," in reference to purchasing the fentanyl from the CD's courier at the Meijer in Englewood, OH.

20. At approximately, 1:30 p.m. an HSI Under Cover Agent (UC) contacted **ALEXANDER** at 424-288-0932 and told **ALEXANDER** that he had the kilogram of fentanyl with him/her and would meet **ALEXANDER** at the Meijer parking lot in Englewood, OH. **ALEXANDER** told the UCA that Meijer was "hot", meaning a lot of police presence. **ALEXANDER** attempted to sway both the UC and the CD to change the location of the exchange over the next thirty (30) minutes through multiple recorded telephone calls with the UC and BBM with the CD.

21. At approximately 2:00 p.m. **ALEXANDER** sent a message to the CD agreeing to meet the UC at the Meijer parking and that **ALEXANDER** needed twenty-five (25) minutes to grab the money.

22. At approximately 2:40 p.m. investigators observed **ALEXANDER** pull into the south entrance of the Meijer parking lot driving a black, Chrysler 300, Ohio registration A1QM#3. **ALEXANDER** parked in the rear of the Steak and Shake restaurant and appeared to be conducting counter-surveillance to observe if any Police may be in the area.

23. **ALEXANDER** again contacted the CD and told the CD that Meijer was "hot" and wanted the UC to follow **ALEXANDER** to a different location because **ALEXANDER** did not have a good "feeling" about meeting in the Meijer parking lot.

24. **ALEXANDER** then drove toward the UC'S Ford Expedition which was parked in the south west corner of the Meijer parking lot. **ALEXANDER** extended his hand through the driver's side window of the Chrysler 300 while holding what was later determined to be $50,000 in U.S. Currency in the other hand. At the last moment **ALEXANDER** withdrew his hand and did not accept the sham package of fentanyl; however the UCA did observe **ALEXANDER** in possession of the U.S. Currency.

25. Investigators observed and followed **ALEXANDER** as he drove through the parking lot of Meijer and then turned south on N. Main St. Investigators were observing **ALEXANDER** using mobile surveillance as well as using a Customs and Border Protection (CBP) Air and Marine Helicopter equipped with a video recording system.

26. At approximately 2:42 p.m., a Trooper with Ohio State Highway Patrol (OSP) who was assisting with operation conducted a traffic stop of **ALEXANDER** due an equipment violation on the Chrysler 300. The traffic stop location was directly across N. Main Street from Meijer's north parking lot entrance.

27. An OSP state certified narcotics detection K9 conducted a free air sniff of the vehicle **ALEXANDER** was operating which resulted in a positive indication for the presence of narcotics. OSP Sgt. Coverstone asked **ALEXANDER** where he was headed to which **ALEXANDER** replied, he was going to Steak and Shake, then McDonalds and then to the Gym.

28. At 2:52 p.m. Sgt. Coverstone advised **ALEXANDER** of his Miranda rights and talked to **ALEXANDER** about marijuana being in his vehicle. **ALEXANDER** gave Sgt. Coverstone a EVAP THC pen from his shirt and told Sgt. Coverstone that he smokes it and that the pen has THC in it. **ALEXANDER** told Sgt. Coverstone that he had cash in his vehicle that was about "50 some grand." When Sgt. Coverstone questioned **ALEXANDER** about the currency in the back seat, **ALEXANDER** stated that he owns a car lot and just sold an SRT8 and that he was taking the currency from the car lot to his house but stopped for something to eat.

29. A probable search was conducted of **ALEXANDER'S** vehicle which led to the discovery of $50,000 of U.S. Currency inside a shoe box located in the back seat and an opened vacuum seal bag containing fifty-five (55) .55ml alleged THC liquid refill bottles and five packs of alleged THC edibles. The THC bottles appeared all to be full with a converted weight of 23.68 grams and the THC edibles weighed 312 grams.

30. **ALEXANDER** was transported to the Dayton OSP Post by OSP Troopers for further interview by investigators with HSI and DEA.

31. At approximately 3:25 p.m., your Affiant along with DEA Special Agent (SA) Charles Vill conducted an audio recorded interview with Damone **ALEXANDER** at the OSP Dayton Post in a conference room. **ALEXANDER** was not handcuffed and agents were

wearing plain clothes with their weapons concealed. **ALEXANDER** was advised that he was not under arrest. Your Affiant and SA Vill introduced themselves to **ALEXANDER** by displaying their credentials and informed **ALEXANDER** the Special Agents were going to question him regarding the circumstances surrounding the currency discovered in his vehicle.

32. Your Affiant informed **ALEXANDER** that although his Miranda rights were given to him by OSP Sgt. Coverstone SA Turk would cover them again. SA Turk read the Miranda rights to **ALEXANDER** to which **ALEXANDER** said he understood but was he was unwilling to sign the Department of Homeland Security waiver of rights Miranda form. **ALEXANDER** did indicate he was willing to speak with agents without a lawyer present.

33. In whole and in part, **ALEXANDER** gave the following information regarding the $50,000 U.S. Currency discovered in his vehicle: **ALEXANDER** was moving his savings from his residence at 132 Westrock Farm Dr., Union, OH to his residence on Well Fleet Dr., Dayton, OH due to a break-in at a neighbor's house and car break-ins on Westrock Farm Dr. and fear of losing his savings.

34. **ALEXANDER** would go on to contradict the addresses from which he was moving the currency and stated he was moving the currency from his residence on 5041 Well Fleet Dr. to 132 Westrock Farm Dr. **ALEXANDER** stated he doesn't like to keep his money in a safe or the bank.

35. **ALEXANDER** stated he owns "Let's Make a Deal Auto Sale" car dealership as well as the real estate Let's Make a Deal Auto Sale occupies. **ALEXANDER** stated the property has two other car dealerships on it as well. **ALEXANDER** stated the $50,000 that OSP discovered in his vehicle was proceeds he saved from the sale of vehicles from his dealerships, DLA LLC and Let's Make a Deal.

36. Following the interview, **ALEXANDER** called his fiancée from the Dayton OSP Post for a ride home due to him having a suspended driver's license. Investigators conducting surveillance observed a female depart **ALEXANDER'S** residence at 132 Westrock Farm

Dr., Union, OH driving a black Chevy Sedan. A short time later, investigators observed a female operating a similar black Chevy Sedan pull into the Dayton OSP Post and meet with **ALEXANDER**.

37. The suspected THC liquid bottles and edibles were submitted to the OSP Crime lab for analysis.

38. At approximately 6:00 p.m., the CD received several text messages from **ALEXANDER**. **ALEXANDER** explained that he "pulled off" (from the fentanyl purchase at Meijer) because "it didn't feel right." ALEXANDER went on to say that "I told you it was hot in that area," and that "they took my money."

39. Based on the facts set forth in the Affidavit, your Affiant believes that there is probable cause to issue a criminal complaint and arrest warrant against Damone **ALEXANDER** (**ALEXANDER**), for violations of 21 U.S.C. §§ 846 and 841(b)(1)(A) (attempt to possess with intent to distribute 1 kilogram or more of fentanyl, a Schedule II controlled substance).

_____
Brian Turk, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on April 23, 2018

_____
Honorable Michael J. Newman
United States Magistrate Judge